Good morning. If it pleases the court, Norman Schaffler on behalf of the appellant. I apologize for my voice, but I had some throat surgery and it's healing slowly, so I'm not dying. I'm just a little bit shortchanged on the volume. Your Honors, as I reviewed this case, having tried it, and reading the transcript over and over again, and as I indicate in my brief, I think there are five major problems that have occurred in this case. I put them in a certain order in my brief for no specific reason, but as I think about it, I think that the most important one perhaps was the changing of the jury instruction that the jury was so concerned about and Judge Garcia removing the word interstate from the jury instruction when he had previously made it. Didn't you specifically agree to that? No, I did not agree to it. I objected to it. Judge Garcia said I'm going to do one of two things. I'm going to do A or B. And I think my comment was, well, you know, if that's the best we're going to get, that's what we're going to get. I never said, yes, I agree that you're right. Well, maybe we need to find where in the record that statement is made because I remember otherwise. You would agree, would you not, that in the event that the record shows that you either expressly agreed to using the word commerce alone or by your actions you condoned it, that under our case law, under Perez, that an invited error does not yield any kind of benefit to you? The answer to the first half of your question is if I specifically agreed to it, I would agree with you. I don't think I can agree to it by conduct when I specifically objected to it during the discussion of the matter. So are you telling us that what, when we look at the record, it's going to show that at the end of the discussion, you said, Your Honor, I just object. I know we've had this colloquy and I object. Is that what you're going to say or are you going to say, well, I don't agree, but go ahead. I didn't say, my recollection is I didn't say I don't agree, but go ahead. My recollection is that Judge Garcia said you've got one of two choices, and these are your two choices, and this is the one I'm inclined to do. And I think my response was, if that's what you're going to do, that's what you're going to do, or if that's the best you're going to do, that's what you're going to do. Well, what you actually said is on page 125 of the supplemental excerpts of record. I don't know if you have that before you. I don't, Your Honor. And in the discussion, you said, and I believe if you take that and strike the word interstate after it, then leave it, it affected commerce. But I think that's about the most innocuous thing we can tell the jury. I mean, I read that as you being fine taking the word interstate out. Well, I'm sorry that you read it that way. The problem is, as I see it, is I objected to it originally, and he's telling me I've got one of two choices. Okay? That's it. The court then follows up on your statement by saying, let me think that through. So it wasn't, it doesn't sound like the court was giving you two choices and you chose one because the court then wouldn't respond, let me think that through. You're saying that as a possible alternative, that it would read, quote, if you find that the government offered no proof that the alleged conduct affected commerce, you should take that into consideration in your deliberations. Close quote. Mr. Schaffler, yes, sir. Well, if I did that, I would add the term, the dictionary term commerce. I would tell the jury that the word commerce in the instruction is used in its ordinary dictionary sense, that is, commerce is buying and selling of goods. What do you think, Mr. Schaffler, if that's my alternative, and that suggests something to what you've said, if that's my alternative, Your Honor, I'm stuck with it. I don't think we need that part of it. If that's what the court is going to do, that's what the court is going to do. But it does sound like he was following a suggestion that you offered him. Well, it was, Your Honor, believe me, it was not my suggestion. In any event, with regard to my other comments, I think the judge misapplied the sentencing guidelines, the intended loss issue here. Susan Serrano did bill for just in excess of $2.5 million with everything. However, I think intended loss was meant to be, as it was codified, if you bill for $2.5 million and you expect to get it, and for some reason the government catches the problem before they pay you, you can't say, oh, well, you know, I billed for it, but I didn't get it. In this case, the intended loss could only be what she was actually paid because there are strict maximum limits on every code section by the rules of Medi-Cal and Medi-Cal. Well, explain this then. Why did she bill over $2.5 million if all she ever possibly could have received was some $800,000? Well, I guess I have to go to some of my personal knowledge on this subject. I'm a dentist as well as an attorney. I don't practice dentistry. You cause pain on a lot of levels. Well, perhaps more so by practicing law than practicing dentistry. One never knows. But the fact of the matter is what you get is program software. And with many of the insurance companies that you deal with, you bill what is in your computer software. They have a schedule of maximum allowances. And every single insurance company is different. Now, if Susan Serrano had billed Medi-Cal for just what their maximum schedule of allowances was, then other companies could come in and say, well, if you're billing Medi-Cal for this number, that's your usual and customary fee. And when you bill us for more, you're billing us for more, and that's not your usual and customary. But, counsel, isn't your interpretation belied by the guidelines themselves? I'm quoting now from it looks like Guidelines Section 2B1.1A2i, and this is intended loss. And it defines intended loss, and it says, intended loss, Roman I, means the pecuniary harm that was intended to result from the offense, and Roman II, and this is the important part, includes intended pecuniary harm that would have been impossible or unlikely to occur, such as in a government sting operation or an insurance fraud in which the claim exceeded the insured value. Isn't the latter exactly equivalent to this computer program you're talking about? There would have been no possibility for her to get that, but when she billed it, just like if somebody tries to collect more than the face value of an insurance policy, they're never going to get it, but that was the intent. No, I don't believe it was the intent, Your Honor. When anybody bills a government agency where there's a schedule of maximum allowances, by overstating the claim, you virtually guarantee that you're going to get whatever the maximum is that the government will offer. If you understate the claim, that is, if you offered some other formulation, you may get some amount less than the maximum. That's absolutely true. There's a great deal of incentive here to be sure that you're always above the maximum that Medicare or Medi-Cal will pay. Well, that's true. But, of course, the fact of the matter is it wouldn't have made any difference. Obviously, if she billed less than what the maximum allowance was, she wasn't going to be paid the maximum allowance. But the point is, by billing for more, she doesn't intend the government to pay her the difference between the maximum allowance and what her actual billing was. But if I have a homeowner's policy and say the maximum is $500,000, and a hurricane comes through and my home is destroyed, and I put in a claim for $750,000, is it your view under the guidelines? Not a hurricane came through. There was a ‑‑ I phoned up some destruction of my home. Would it be your view that the guideline calculations would be the half a million or would it be $750,000? Well, with all due respect, Your Honor, I think we're discussing apples and oranges. If I could change ‑‑ But what's the answer, though, before we talk about the oranges? Well, if I can change your hypothetical slightly to indicate that if they said if you lose your garage, you get X, if you lose your outbuilding, you get Y, and if you lose your house, you get Z, then I would say, no, you're incorrect. But if you're ‑‑ I just think your example doesn't fit these facts. These facts are specific maximum allowances for a specific service. Okay. And my specific maximum insurance is $500,000. But I'm going in hoping maybe they'll pay me a couple hundred thousand more. Maybe not. Maybe it's for the reason Judge Biby stated. I don't want them to start to nickel and dime it so they come under the $500,000. So I ask for $750,000 or a million. It seems to me, based on the guideline provision, the application note, the intended loss is the higher figure. I don't think you can come to that conclusion. I don't think anybody who has a $500,000 maximum on an insurance policy, no matter how much they send bills to the insurance company for, is ever going to get paid more than $500,000. That's the limit of the policy. But you're ignoring, are you not, counsel, the intended loss definition I just mentioned. I mean, I don't understand how you can construe that out of existence. That is an exact corollary to what your client is alleged to have done. Well, as I said, Your Honor, I respectfully disagree with you. Can you cite any authority that would validate your position regarding the construction of this portion of the guidelines? Can you tell us why the guidelines either are unconstitutional or why we've misread them? Well, I think they're constitutional, but I think they're being misread or misapplied here. I think the reason for intended loss is to say if you billed for something and you could reasonably expect to have been paid for it, even though you never were, that's what you intended the loss to be. That's not what the guideline says. This includes billings in this case for which you could never have been paid, as in a government sting operation or as in a claim against an insurance policy in excess of the face amount. The guidelines speak of something that could not have happened. And that's the very thing you're pointing out, I think, is that there's no way that your  And that's what the Medicare internal guidelines provide. That's correct. That's exactly what this section of the guidelines provides, is it not? Your Honor, I don't read it the same way you do. And again, I asked before, do you have any authority for your position? I don't. I appreciate your erudition, but I'd like some authority. Such as it may be. No, Your Honor, I don't. Okay. It just seems to me, logically, when you say intended loss, there was some hope on the part of the perpetrator that they would get something to which they were not entitled. Okay? Where there is no possibility, not because she got caught or because it was a sting operation or anything else like that, that she didn't get the money. But it's that she was never going to get the money, no matter what happened. And that's my point on that. I would like to go on with the other issues. I think a large portion of this claim has to do with hearing aids. And the government did not break down the difference between her audiology license and the hearing aid. And as I cited, there's a code section that, the way I read it, and maybe I've misread this one too, says if you have an audiology license, you don't need a hearing aid license. Judge Garcia objected to my reading of that and indicated to the contrary. But, frankly, the way I read Judge Garcia's comment, as I said in my brief, if you don't need a driver's license, you're not going to drive. I will go on to comment on the things that Judge Garcia did during the trial, which I think seriously interfered with the ability to cross-examine and represent my client, cutting me off on a number of occasions, making comments in front of the jury, as I've stated in my brief, on a number of different issues. And that can be ---- You would agree, would you not, that we're talking about plain error here? You didn't object to any of these points in trial? When I ---- yes. When I ask the question and I'm told, you know, you know better than that, okay, I understand your brief is clear about these points. I'm simply asking the standard of review from our perspective in this case is plain error, right? Okay. So under that circumstance, then, in order to demonstrate that these statements amounted to judicial misconduct, under the Lawrence case, the 1988 case from our circuit, you've got to establish, and I'm quoting, the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality. Did you meet that standard? I don't know how I can go into Judge Garcia's mind, but with the numbers ---- But counsel, regardless of that, don't you bear the burden in this instance to show that that standard has been met? I think the standard was met. And where in the record can we find anything to show actual bias or that it leaves an abiding impression that the jury perceived an appearance that the judge was an advocate or partial? By the numbers of incidents that occurred, by the tone of the incidents that were and Judge Garcia's tone in stopping me and supporting the government witness when there was a statement made to ---- I ask a question. I ask a reasonable question. I've been trying cases for 30 years. I've never had a judge stop me and say, you know better than to ask a question like that. And you can't argue with Judge Garcia. Okay? There's no way. A, he's going to be the one who's sentencing my client. You know, there's too much risk involved here to just openly and blatantly in front of a jury start arguing with the man. But I believe that the number of incidents bear out my position. Finally, with regard to some of the government exhibits that I've discussed, I think there's no question about the fact that they were manipulated. In spite of the fact that I objected to them, Judge Garcia allowed them into evidence. And I think when you take that, any of these incidents individually, but all of these errors in totality say something ought to be done, this judgment ought to be reversed. Thank you very much. I reserve my last few minutes. Thank you, Mr. Schaffler. We'll hear from the government. Good morning. May it please the Court. My name is Matthew Siegel, USA. I represent the United States in this case. Your Honor, this is a case, as the Court knows, of pure fraud. The defendant was doing, billing for procedures. We don't know what she was doing. All required doctor's referrals. Not one doctor's referral was actually made. All of the doctors were either dead, had never met her, or had stopped referring patients to her literally years before the charge period began in 97. Her hearing — so that is one reason that all of her billings were invalid. You know, forget — sir. No, go ahead. Forget everything about the hearing aid license or, you know, whether all of the patients were dead or she never met them. This was never referred. So that's the question I actually wanted to ask and understand, because it's not 100 percent clear to me. The five physicians that were listed, those encompass the total of the $2,500,000 plus that she had billed out. Yes. All right. Because you are very close to that $2.5 million within the guidelines, and you're only over by $30-some-thousand. I understand that, Your Honor. And that only happened when Dr. Fordham — when the Dr. Fordham analysis happened. Then, as relevant conduct, they started looking at Dr. — treatments where she had used Dr. Fordham to justify billings, not to Medi-Cal, but now to Medicare. And that put her over the threshold. All right. But the full $2.5 million plus was based on prescription by five physicians that were not existent in her life at that point in time. Right. With all those qualifiers. In her life at that point in time. Right. And that's set forth clearly in the pre-sentence report and found by the district court. So forget about the dead patients or the patients from nursing homes who were not provided the services for which she billed. But look just at the absence of referrals. This is pure fraud. Now, in that light, I think that I'd like to spend most of my time with the court talking about the commerce instruction and the loss analysis. On the other hand, I don't want to talk the court out of anything either. What does the statute provide? Does it say interstate commerce or commerce? The statute says commerce. So, in effect, what the judge in this case included was the very language of the statute. Exactly, Your Honor. And that's why I think — and we did another review before I came here, looked around the entire United States for any pattern of jury instruction on 18 U.S.C. section 1347. There isn't one. There's none. And so it can't be plain error to charge in the language of the statute when there's no authority in this circuit or any other that — The argument would be the statute would be unconstitutional and the commerce part would be the argument. That would be the argument. And the only case I'm aware of that addresses that in the context of the definition of health care program under 18 U.S.C. section 24B is the Third Circuit in Whitehead. And that case involved a $34,000 theft — $34,000 of relevant conduct, but I think only $5,000 of charged conduct from a local chiropractor. This chiropractor was being paid by check, and it was the practice for patients to endorse the checks, and I think their receptionist was taking some of the checks and depositing them into her own bank account. And I think she — that was an as-applied challenge that Congress had exceeded its power under the Commerce Clause. And the Third Circuit — and this is before Raich — the Third Circuit says, no, this is plainly a gigantic — this was part of HIPAA, which was a gigantic statute that may not include congressional findings, but includes some committee reports and a legislative history indicating that Congress viewed fraud and abuse in the health care system as a nationwide problem and didn't see any reason in those facts to find it unconstitutional. And certainly here, I mean, for heaven's sake, it's Medi-Cal. It's 50 percent federally funded. It's a gigantic program in the State of California. They purchase goods from out of State. As applied in this case, no way. Roberts. Well, if there was not invited error, and if we try to avoid constitutional issues, wouldn't a harmless error analysis apply here, looking at Nader and — Yes, absolutely. The uncontroverted — if you look at this as an omitted element, and that is probably the most prudent thing to do, either to look at this as plain error or as harmless error, the court will look at the transcript and decide whether, in light of the Ninth Circuit's strict criteria and Perez, whether it's invited. But even under the most relaxed — the best for the defendant standard of review, this is an omitted element. There was uncontroverted evidence that this program is affecting interstate commerce. Medi-Cal is 50 percent funded by the Federal Government and purchases goods from out of State. The only time that the defendant addressed this issue was on cross-examining one of the Medi-Cal investigator witnesses, and he said, now, Medi-Cal is funded 50 percent by the Federal Government, isn't it, or something to that effect. There's no way under a Nader analysis that the court can be reversed on the jury instruction in this case. So unless there are further questions on the — really, if this were a — if you were going to look at this de novo, and I don't think you should, whether that word should be implied is kind of the struggle between literalism and federalism, right? I mean, need it be interstate commerce? You don't need to reach it here, and I think that the court ought not. Turning to the loss, all of the defendant's billing was a loss to Medi-Cal because none of it was supported by a valid doctor's referral. Even the guideline commentary that Your Honor, Judge Smith was referring to was added to the 2001 book, and it's been there since — from then until 05, which is the book that was applied in this case. I think this is exactly the case of an insurance fraud claim that exceeded the policy limit. There's really, to me, no other way to look at it. But even if it weren't that, and we were in a 2000 guideline book where we didn't have that guidance from the commission, then think of this circuit's teaching in Cooper, and that's the case where there was a contract to dispose of sewage sludge for the city of San Diego, and the sewage sludge wasn't disposed of in a way that was specified. They were supposed to have composted it, but they didn't compost it. Well, I mean, these are, in this case, the defendant says, and it's only the defendant's testimony that she actually did some services, says that she did some services, but none of them were supported by doctor's referrals, and it wasn't up to spec, and there should be absolutely no offset, and she really must, in order to account for her full capability or full culpability, accept the $2.5 million. Well, what's the law on a, you know, whether it be mail fraud, wire fraud, health care fraud, offense that straddles a change in the guidelines, some conduct occurring before, some after? If the defendant had briefed that, I would have as well, Your Honor. I believe that in a straddle case, when a scheme – Do you look at it like a conspiracy is the question? If it's a conspiracy, then you apply it throughout. I'm not sure in a fraud case. I'm aware of law that treats, in this circuit's law, that treats a fraud scheme like a conspiracy for other purposes, but I don't, standing here, want to shoot from the hip and address something that isn't briefed. Because some of the loss was pre-2001 amendments. It was. Pre-merger of 2F and 2B. Absolutely. The charge period begins January 1st, 1997, and that's when the defendant's hearing aid dispenser's license expired. I think that may have been why it was chosen as the charge period. I gather, counsel, that the government's position would be that since this was not raised by the defendant in her appeal, that this is waived. So there would be no issue here. That's right. And, Your Honor, I brought a case that says that. It's EULA, I believe, that has to be raised specifically and directly in the briefs. It hasn't been. But I do want the Court to understand that it's not working any sort of injustice by applying the guideline that was accepted in the district court as the guideline and I think is anyway consistent with this Court's teaching from before that guideline. Now, I don't think I have anything more on loss unless the Court has questions. All right. The next question is the issue of whether the obstruction enhancement applies. And this question of California law that counsel brings up, that is the whether California Business and Professions Code Section 3350 and 3351.3 permit an audiologist without a hearing aid license to provide hearing aid services, only comes up at sentencing in the context of whether the district court is going to apply the obstruction enhancement. And so it's worth noting initially that there are three bases upon which the application of 3C1.1 rested. The first is that the defendant testified that she didn't know that her hearing aid had expired. The second, she said that somebody at the Hearing Aid Bureau said go ahead and practice because you have your audiology license. And then the third, and this was the really breathtaking and also material one, is she said that she'd been going around with Dr. Fordham to nursing homes and he was writing scripts and referrals for her so she could do all of these things. I'm going to start with Dr. Fordham. A doctor is required at every step of this process, that is for an audiology exam or to distribute a hearing aid, and that's in the supplemental excerpts of record at 11 and at 60, and it's in Volume 1 of the unexerted transcript at pages 110 through 111. It just didn't happen. I mean, Fordham testified and he was credited by the jury and by the judge. And it was not clear error for the district court to make that factual determination. The next lie by the defendant was that she said that her, she didn't know that her hearing aid license expired in 1997. Now, we know that she knew it in 2002 because she wrote a letter to the Hearing Aid Bureau and she was sending letters, she was retaking the test. The district court also had the benefit of hearing testimony that the expiration date of her hearing aid license was on her card. Now, I don't look at my bar card a lot, but, you know, I'm aware that they come out every year and that there's an expiration date. I couldn't tell you the expiration date of my driver's license, but I know that it's on there and from time to time it might be prudent to look at it. And in the context of this defendant's incredible testimony on other subjects, that is Dr. Fordham, that she said that the treatment authorization request, these aren't the doctor's referrals, but the pre-authorization requests that you need to fill out in order to give a hearing aid or to treat anybody in a nursing home, she put sometimes in typed and sometimes handwritten her hearing aid license number. And she said that that was the software that created that and then said, well, no, no, no, it's my staff that must have done that. All right. So then you get to, and the application of California law is only relevant within that context. And the district court judge says, I don't believe that anybody from the Hearing Aid Bureau could have told you that you can go ahead and practice because you have an audiology license, because that's a total misinterpretation of California law. And what California law says is 3350 puts a broad prohibition on any, this is business and professions code 3350, imposes a broad prohibition on the dispensing of hearing aids or performing hearing aid services unless you have a license from the Hearing Aid Bureau. Then 3351.3 carves out an exception for licensed audiologists. That is, you can do some of, you can, this prohibition doesn't apply to you if you're an audiologist. But then there's an exception to the exception, which is this exception does not apply to you if you're engaged in the business of selling or offering for sale of hearing aids. Now, that's exactly the business that, that is the nature of much of the defendant's fraud. I couldn't tell you for sure if she was actually engaged in the business of selling hearing aids, because the only evidence that she ever gave anything to anybody is from the defendant. Now, Yvonne Crawford from the Hearing Aid Bureau testified in Volume 4, and counsel never asked her if that was a valid interpretation. Is there any objection raised by counsel in the trial about this particular issue? This didn't come up in the trial. This is only sentencing. Your Honor, I'm prepared to address the questions of the admitted documents and the comments of the Court. I'll briefly talk about the documents. I think it's already set forth in my brief that whether a document is complete or not, it doesn't go to admissibility. It goes to its weight. I think the use of the term misconduct is unwarranted in this case, as the entire document was disclosed to the defendant in this case. And, you know, and this goes to the comments issue. So counsel then wants to cross-examine the witness who was talking about a document that was given in an incomplete form as a government exhibit. There's never any question that the defendant got the entire version of the document. Right? So there's no, there's no, you know, we get to make our exhibits and, you know, and he gets to make his cross-examination and that's exactly what happened. Is this the same exhibit that he claims was manipulated? Is that the same or are we talking about a different exhibit? You know, there are two that he claims were manipulated. That came out of trial. I mean, he cross-examined. Absolutely. So the system worked as far as the weight of the evidence. I mean, he was able to make those arguments. That's how we see it, Your Honor. And there's no argument. And he got both, he got complete versions of each of those exhibits. Right? And the counsel's argument as well, Exhibit O, which was this entire banker's box full of explanations of benefits, which are the letters that Medi-Cal kicks out after they pay a claim, you know, based on the honor system, that's the real evidence. That was offered and admitted into evidence as well, and the jury was able to take it into the room and, for what it was worth, compare it to, you know, to the CDRs, the claims detail reports that the government was offering. It's quiet. Does the Court have any questions for me? Thank you, Your Honor. Thank you, counsel. Mr. Schaffler, I think you reserved a couple of minutes. Thank you very much, Your Honor. I think this says I've got four minutes. I may take it. Mr. Siegel is not correct about something that's very important here, and that is that there were no valid referrals. In order to get prior authorization from Medi-Cal, one of the documents that Susan Serrano would have to send to Medi-Cal was this written referral from the physicians. There were written referrals in every one of the files. Mr. Linard, who tried this case, and the investigators who were investigating this case and testified, never showed one of these referrals to any of the doctors and said, is this your signature? Didn't happen. Did you object to that at trial? I did object to that, Your Honor. And what was the ruling by the Court? The ruling by the Court was simply, you're overruled, go on. Judge Garcia was very abrupt with his overruled. I mean, for instance, on the occasion when I objected to the way Mr. Linard was literally screaming at the defendant when she was on the witness stand, and I asked the Court to stop it, and he wouldn't. He just said, you're overruled, sit down. Okay? Now, with regard to this ---- The pre-sentence report, though, in paragraphs 10, 11, and 12, set forth the facts relating to these five physicians and that they did not, in fact, sign these referrals. There were signed referrals in every file, and there was no proof that those signatures were forged. There was no indication that any of the signatures were anything other than from the physicians whose names appeared on the document. Okay. Well, Dr. Leong died in 1983, so what are we to do with that? Assume that because there wasn't evidence that was a fraudulent signature that it was valid? She never billed or had a referral from that doctor that she knows of who died. You've heard and I've heard every ---- all the time on television about somebody taking somebody else's identity. All she got was a referral, written referral, from a physician who said, this is the patient and this is what the patient needs. Without that written referral, I mean, there's a strange credibility to say, this doctor's been dead for a number of years, but we're going to accept a referral from him, and that Medi-Cal doesn't know he died six months ago or ten years ago? It's like one of the patients. I think it was Mr. Myers who had died some 15 years before there was billing for him. It's a dead letter exception. Yeah. Yeah. Well, did you object at sentencing to those paragraphs that I just referred to? Yes. You did. All right. Yes. Now, I would like to also discuss for just my remaining minute Mr. Siegel's comment that I got the entirety of the two documents that I claim are manipulated. That is false. That is completely untrue. What Mr. Linhart brought to the Court after I objected to that exhibit was an updated version of it, not the correct version, not the one that the patient ---- the pages had been, call it whatever you want, intentionally excluded. I mean, Mr. Linhart himself says on some of the testimony that maybe we just thought that part of it was irrelevant. I never got the complete document, exhibit 57. I got an updated version which the judge chose to accept. I don't know if the instructions were the same. I don't know what was different about it. And there's no way to tell. And under the circumstances, I don't think it should have been admitted. With regard to that particular claim detail report where page 14 through 18 were missing, well, yeah, I did get page 14 through 18. Otherwise, I wouldn't have known they existed. But the very fact that they were missing and Mr. Linhart said, well, I don't know, maybe we just thought they were irrelevant, so we left it out. Somebody made a mistake at his office and sent me page 14 through 18, which he perhaps should not have done under the circumstances. But the fact is they did. And then they intentionally omit them from the exhibit, and they say, oh, we didn't do anything wrong. I think they did several things wrong. And that was just one of them. And I think I have 45 seconds left, and I don't know. You're actually over 45 seconds. Oh, I'm sorry. You're right. I see the red lights on. Thank you very much. Thank you. So before the argument, United States v. Serrano is submitted. And with that, we have concluded the calendar for the day. The court will stand in recess until tomorrow. All rise. This court, this session stands adjourned. Thank you.
judges: Goodwin, Bybee, Seabright